UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
DURHAM DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| Clean Burn Fuels, LLC, | ) | Case No. 11-80562C-7D |
| | ) | |
| Debtor. | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| | ) | |
| Sara A. Conti, Chapter 7 | ) | |
| Trustee for Clean Burn Fuels, | ) | |
| LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary No.   12-9081 |
| | ) | |
| Sampson-Bladen Oil Company, | ) | |
| Inc., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

<u>MEMORANDUM OPINION</u>

This adversary proceeding came before the court on April 22, 2014, for hearing on the Plaintiff's Motion for Summary Judgment and the Plaintiff's Motion in Limine to Exclude Defendant's Expert Report. John Paul H. Cournoyer appeared on behalf of the Plaintiff and Douglas Q. Wickham appeared on behalf of the Defendant, Sampson-Bladen Oil Company.

JURISDICTION

Subject matter jurisdiction and jurisdiction over the parties exist pursuant to 28 U.S.C. §§ 151, 157, and 1334. Venue is appropriate in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## NATURE OF THIS PROCEEDING

The Plaintiff seeks to recover payments in the aggregate amount of $194,016.64 made by Clean Burn Fuels, LLC ("Debtor") to the Defendant within 90 days prior to the commencement of this case as preferential transfers pursuant to sections 547 and 550 of the Bankruptcy Code.   Defendant concedes that the two payments are preferential transfers pursuant to section 547(b), but contends that such payments fall within the "ordinary course of business" and "ordinary business terms" exceptions provided in section 547(c)(2) and, therefore, may not be avoided by the Plaintiff.   The Defendant has proffered the affidavit and written report of Vera Haskins, the Defendant's expert, in support of its section 547(c)(2) defenses. The Plaintiff asserts that the two transfers were not made in the "ordinary course of business" nor "according to ordinary business terms" under section 547(c)(2) and has moved to exclude the affidavit and written report of Vera Haskins.

## FACTUAL BACKGROUND

The record before the court includes the following undisputed facts.   The Debtor filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code on April 3, 2011 (the "Petition Date").   The Debtor's Chapter 11 case was converted to a case under Chapter 7.   The Trustee was appointed by an order entered on September 4, 2012 and she initiated this adversary proceeding on October 11, 2012.   The Plaintiff seeks to avoid two alleged

- 2 -

preferential transfers made within the 90 days prior to the petition date pursuant to 11 U.S.C. § 547 and recover those funds for the benefit of the estate pursuant to 11 U.S.C. § 550(a). The 90 day period for which preferential transfers may be recovered spans from January 17, 2011 to April 03, 2011 (the "Preference Period"). The other transactions between the Debtor and the Defendant that occurred prior to January 17, 2011 make up the baseline of dealing (the "Baseline Period").

The Debtor owned and operated an ethanol plant in Raeford, North Carolina, and was in the business of manufacturing and selling ethanol, a clean-burning, high-octane fuel produced primarily from corn. The Defendant is in the business of both retail and wholesale distribution of petroleum products and lubricants, predominately in eastern North Carolina. The Defendant's wholesale distribution is to convenience store operators and other commercial customers and to some government agencies.

The relationship between the Debtor and the Defendant commenced on September 15, 2010, less than seven months prior to the bankruptcy filing, when the Debtor and the Defendant entered into their first sales transaction. In this transaction and the transactions that followed, the Defendant sold and delivered gasoline to the Debtor for use as a denaturant in the ethanol manufacturing process. No supply agreement was signed between the

Debtor and the Defendant. The final shipment of gasoline was sold and delivered by the Defendant to the Debtor on February 18, 2011.

Between September 15, 2010 and February 18, 2011 the Defendant shipped the Debtor a total of 78,001 gallons of gasoline for which the Debtor was charged $248,855. The first wave of shipments (the "Baseline shipments") occurred between September 15, 2010 and October 12, 2010 and consisted of four separate shipments of gasoline to the Debtor. The Debtor made four separate payments to the Defendant for these four Baseline shipments. All payments during the Baseline Period were made by printed check drawn on the operating account of the Debtor, and each successive check paid off the earliest outstanding invoice. When the fourth and final check cleared in December 2010, the Debtor's account with the Defendant was fully paid as of that time.

The second wave of shipments (the "Preference Period shipments") occurred about three months later between January 28, 2011 and February 18, 2011. The Preference Period shipments consisted of seven separate shipments of gasoline and one shipment of glycol. Each gasoline shipment during this period was nearly twice as large as the average Baseline shipment because the Debtor was "getting their plant up to speed." After the final shipment of gasoline arrived on February 18, 2011, the Debtor owed the Defendant a total of $194,016.64 on eight outstanding invoices.

- 4 -

Prior to paying any of the outstanding invoices, the Debtor went into "shut-down mode" in late February of 2011 after recognizing that the high price of corn negatively affected its business model to the point that the Debtor was no longer able to sustain its operation. On February 24, 2011, at a time when the Defendant was aware that the Debtor had scheduled a meeting to be held on March 8 to discuss the Debtor's "cash flow issues" with its suppliers, creditors and customers, an employee of the Defendant sent an email to Doug Archer, the Debtor's general manager, proposing that the eight outstanding invoices from the Defendant be satisfied by the Defendant ordering 74,700 gallons of ethanol from the Debtor and having the cost of such purchase applied in satisfaction of the balance due from the Debtor on the outstanding invoices from the Defendant. That same day, such an order was placed by the Defendant and the Debtor thereafter shipped $192,985 worth of ethanol to the Defendant which was just shy of the $193,535 balance owed by the Debtor on the seven outstanding invoices from the Defendant. What had been envisioned as a simple barter transaction, aborted when it belatedly was determined that the Debtor could not sell the ethanol to the Defendant. Instead, the Debtor was bound by an agreement with another party, C&N Ethanol Marketing Corporation (hereinafter "C&N"), which obligated the Debtor to sell all of its ethanol to C&N and obligated C&N to purchase all of the ethanol produced by the Debtor. The Debtor had

- 5 -

not obtained C&N's approval of the proposed sale of the ethanol to the Defendant prior to the proposed barter arrangement nor prior to shipping the ethanol to the Defendant. This problem prompted a series of emails that began in early March among representatives of the Debtor, the Defendant and C&N regarding a solution to the unauthorized shipments to the Defendant. Emails among these parties were continuing when the Debtor held the March 8 meeting to discuss with its suppliers, creditors and customers "operational issues" and the strain on its business model caused by the high price of corn. Representatives of the Defendant and C&N were present at this meeting. The Debtor gave a presentation at the meeting in which the Debtor communicated, _inter alia_, that (i) the cost of corn was increasing faster than the cost of ethanol; (ii) all value in the Debtor was owned by debt holders; (iii) that the Debtor's current cost structure was unsustainable; (iv) operational issues had cost the Debtor significant cash, forcing further equity investment and exhaustion of working capital; (v) the Debtor had limited liquidity and negative current assets; and (vi) chapter 7 or 11 was very possible without help from suppliers and creditors. The Debtor then proposed a plan that called for concessions from its creditors and suppliers in order to avoid a bankruptcy filing. Before the end of the meeting, there was a breakout session during which there was a meeting between representatives of the Debtor and

the Defendant which included a discussion of the seven outstanding gasoline invoices from the defendant.

During the course of the emails and discussions involving the Debtor, the Defendant and C&N, the parties agreed that in order to account for the fact that the Debtor was not authorized to sell the ethanol to the Defendant, the aborted barter transaction would be treated as if the Debtor had sold the ethanol to C&N rather to the Defendant and C&N would be treated as having sold the ethanol to the Defendant. Under the re-scripted transaction, the Debtor would pay the Defendant for the outstanding gasoline invoices, the Defendant would pay C&N for the nine shipments of ethanol delivered by the Debtor and C&N would make a corresponding payment to the Debtor for the ethanol in accordance with its agreement to purchase all of the ethanol produced by the Debtor.

At 8:20 on the morning of March 9, the day following the meeting conducted by the Debtor, Jeff Smith, the Defendant's CFO, sent the Debtor an email which stated "We reached an agreement with Kirk Bradley and Doug yesterday that [the Debtor] would remit payment today of $193,534.92 for the denaturant. Please wire the funds to [our] account as soon as you receive the proper approvals. This method will help expedite [our] payment to C&N for the ethanol." Affidavit Ed Sanz, at ex. E (emphasis added). Approximately seventy minutes later, a handwritten countercheck drawn on the Debtor's payroll account in the amount of $193,534.92

was deposited in the Defendant's checking account at BB&T where the Debtor's checking accounts also were located. The handwritten check was delivered to the Bank by a representative of the Debtor for deposit to the Defendant's bank account and cleared the Debtor's payroll account at 10:08 a.m. This check was the only handwritten check drawn on the Debtor's payroll account—all other checks from that account were printed checks—and the handwritten check also was the only payment made from the payroll account that was unrelated to the Debtor's payroll obligations. The Debtor's payroll account records reflect that of the more than 150 checks issued from January 1, 2011 through the Petition Date, the next largest check issued from the payroll account, other than the March 9, 2011 countercheck, was a payment of $4,462.91 to the Debtor's general manager. These records also reflect that this check was the only handwritten, countercheck that the Debtor issued to the Defendant and the only check that was hand delivered to the bank. Following the $193,534.92 payment to the Defendant, the Defendant wired payment to C&N for the ethanol that it had received from the Debtor and C&N paid the Debtor for the purchase price of the ethanol. On March 22, 2011, the Debtor transferred $481.72 to the Defendant via printed check from the Debtor's operating account. This check settled the outstanding glycol invoice.

DISCUSSION

I.   Summary Judgment Standard

Rule 56 of the Federal rules of Civil Procedure is made applicable to this adversary proceeding by Rule 7056 of the Federal Rules of Bankruptcy Procedure.  Rule 56 provides that the moving party is not entitled to summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  In considering a motion for summary judgment, the court must construe the "facts and inferences drawn therefrom in the light most favorable to the nonmoving party."  Seabulk Offshore, Ltc. V. American Home Assur. Co., 377 F.3d 401, 418 (4th Cir. 2004).  Once the moving party has met its initial burden of proof, the non-moving party must then set forth specific facts sufficient to raise a genuine issue for trial. Matsushita Elect. Indus. Co., Ltd. V. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 1356 (1986).  In determining whether to grant summary judgment, the court's role does not include weighing the evidence or making findings of fact.  Anderson v. Liberty Lobby, Inc., 447 U.S. 242, 249-50, 106 S.Ct. 2505, 2510 (1986).  The proper inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether

- 9 -

it is so one-sided that one party must prevail as a matter of law. Id. at 251-52.

II.  Applicability of Section 547(b)

Section 547(b) of the Bankruptcy Code provides that the trustee may avoid any transfer of an interest of the debtor in property –

> (1)  to or for the benefit of a creditor;
> (2)  for or on account of an antecedent debt owed by the debtor before such transfer was made;
> (3)  made while the debtor was insolvent;
> (4)  made—
>     (A)  on or within 90 days before the date of the filing of the petition; or
>     (B)  between ninety days and one year before the date of the filing of the petition if such creditor at the time of such transfer was an insider; and
> (5)  that enables such creditor to receive more than such creditor would receive if—
>     (A)  the case were a case under chapter 7 of this title;
>     (B)  the transfer had not been made; and
>     (C)  such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

The Plaintiff's preference claim is based upon the payment the Debtor made to the Defendant on March 9, 2011 (the "March 9 Payment") and a payment made on March 22, 2011 (the "March 22 Payment"). Under section 547(g), the Plaintiff bears the burden of proving the avoidability of these transfers pursuant to section 547(b). However, the Defendant concedes that both the March 9

Payment and the March 22 Payment satisfy section 547(b). As such, both parties agree, and the court finds, that the Plaintiff has met her burden and has demonstrated that there are no genuine issues of material regarding whether the two transfers were preferential transfers pursuant to section 547(b). Accordingly, the Plaintiff is entitled to summary judgment as to the section 547(b) issue.

III.  Applicability of Section 547(c)(2)

Even where the trustee satisfies all of the elements under section 547(b), the transfer may not be avoided if the defendant transferee can prove that it is entitled to rely on one of the exceptions listed in section 547(c). See 11 U.S.C. § 547(c), (g). Here, the Defendant relies upon section 547(c)(2) which provides that the trustee may not avoid a transfer,

> (2)  to the extent that such transfer was in payment course of business or financial affairs of the debtor and the transferee, and such transfer was –
> (A)  made in the ordinary course of business or financial affairs of the debtor and the transferee; or
> (B)  made according to ordinary business terms.

11 U.S.C. § 547(c)(2).

Prior to 2005, the "ordinary course of business" defense under section 547(c)(2) was a three-part conjunctive test. The creditor-transferee had to prove that the transfer was (1) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee; (2) made in the

- 11 -

ordinary course of business or financial affairs of the debtor and the transferee; and (3) made according to ordinary business terms. 11 U.S.C. § 547(c)(2) (1994). In 2005 the statute was amended by the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA") and became a disjunctive test. Under the current language, the creditor-transferee may obtain the protection afforded by section 547(c)(2) by proving either that the preferential transfer was made in accordance with the standard practice between the parties or that the transfer was made in accordance with industry norms. The change made by the BAPCPA amendments "substantially lightens the creditor's burden of proof, by allowing the creditor protection from preference recovery if the transfer meets industry standards, regardless of whether it was in the ordinary course of business of the debtor and creditor." Hutson v. Branch Banking & Trust (In re National Gas Distributors, LLC), 346 B.R. 394, 405 (Bankr. E.D.N.C. 2006) (quoting Richard Leven & Alesia Ranney-Marinelli, The Creeping Repeal of Chapter 11: The Significant Business Provisions of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, 79 Am. Bankr. L.J. 603, 637 (2005)). Thus, under the current version of section 547(c)(2), a creditor-transferee must prove that the transfer in question was (1) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee; and (2) made in the ordinary course of business or

- 12 -

financial affairs of the debtor and the transferee; or (3) made according to ordinary business terms.

A.   Was the Debt that Was Paid Incurred
in the Ordinary Course of Business

The indebtedness that was paid by the Debtor was incurred for the purchase of gasoline and glycol, both of which were used regularly by the Debtor at its manufacturing facility.   The Plaintiff concedes that these debts were incurred by the Debtor in the ordinary course of business or financial affairs between the Debtor and the Defendant.   However, the Plaintiff disputes that the payments were made either in the ordinary course of business of the Debtor and the Defendant or that the payments were made according to ordinary business terms.   Therefore, all that remains for this Court to decide is whether the transfers were made in the ordinary course of business pursuant to section 547(c)(2)(A) or made according to ordinary business terms pursuant to section 547(c)(2)(B).

B.   Were the Transfers Made in the
Ordinary Course of Business

Whether a transfer was made in the ordinary course of business of the debtor and the defendant is a subjective inquiry in which the defendant must demonstrate that the disputed payments were ordinary in relation to prior course of dealings between debtor and defendant.   11 U.S.C. § 547(c)(2)(A); In re Milwaukee Cheese Wisconsin, Inc., 112 F.3d 845, 848 (7th Cir. 1997) (transactions

must be ordinary from both the debtor and the transferee's perspectives). In determining whether payments were made in the ordinary course of business under the subjective prong of section 547(c)(2), courts must engage in a "peculiarly factual analysis." See Advo-System, Inc. v. Maxway Corp., 37 F.3d 1044, 1047 (4th Cir. 1994). The defendant-transferee has the burden of proving the applicability of section 547(c)(2). 11 U.S.C. § 547(g). Courts typically examine the "ordinariness" of a transaction by considering various factors which include (1) the length of time the parties were engaged in the transaction in issue; (2) whether the amount or form of tender differed from past practices; (3) whether the debtor or creditor engaged in any unusual collection or payment activities; and (4) whether the creditor took advantage of the debtor's deteriorating financial condition. Kleven v. Household Bank F.S.B., 334 F.3d 638, 642 (7th Cir. 2003); see also Sparkman v. Martin Marietta Materials, Inc. (In re Mainline Contracting, Inc.), No. 09-07927-8-RDD, Adversary No. 11-00040-8-RDD, 2012 WL 5247173 (Bankr. E.D.N.C. Oct. 23, 2012); 5 Collier on Bankruptcy ¶ 547.04[2] (16th ed. 2012).

After reviewing all of the evidence in the record, the court has concluded for the reasons that follow that the Plaintiff is entitled to summary judgment on the "ordinary course of business" defense provided in section 547(c)(2)(A) as to the March 9 Payment but not as to the March 22 Payment.

The first step in making the analysis of "ordinariness" under section 547(c)(2) is to make an examination of the length of time the parties were engaged in their course of business.  Courts make this examination in order to establish the baseline of past practices between the creditor and the debtor.  "[W]hen the parties have an established relationship, the terms previously used by the parties in their course of dealing are available as a potential baseline."  Advo-System, 37 F.3d at 1049-50.  Establishing the baseline course of dealing is essential to the subjective prong of 547(c)(2) because it allows the court to compare the payments made during the preference period to the payments made outside the preference period.  In re T.B. Home Sewing Enters., Inc., 173 B.R. at 795-96.  Generally, such baseline should take into account the entire course of dealing between the parties.  In re Tennessee Chemical Co., 112 F.3d 234, 237 (6th Cir. 1997)("[T]he entire length of the relationship, or at least a material segment of it, should be examined to determine the 'baseline' course of dealings."); In re Pluma, Inc., No. 99-11104C-11G, 00-2070, 2001 WL 1699690 *4 (Bankr. M.D.N.C. April 11, 2001) (evidence of four months of transactions prior to preference period inadequate to establish baseline because the evidence did not represent a material segment of the course of dealing between the parties which extended over a period of several years); In re Hancock-Nelson Mercantile Co., 122 B.R. 1006, 1013 (Bankr. D. Minn. 1991).

- 15 -

However, where the debtor and creditor have only recently begun their relationship, "there is no baseline against which to compare the pre-petition transfers at issue to confirm [that] the parties would have reached the same terms absent the looming bankruptcy." Advo-System, 37 F.3d at 1050.

If the creditor establishes a baseline, the court can proceed to the second step of the 547(c)(2)(A) analysis and compare the disputed transactions to the baseline in order to determine whether such transactions are consistent with the baseline practice. If, however, the Creditor fails to establish a baseline from which the court can compare the disputed transfers, the inquiry ends as the court is unable to ascertain the subjective standard of comparison. In such instance, the section 547(c)(2)(A) defense likewise must fail. See, e.g., In re Central Louisiana Grain Co-op, Inc., 497 B.R. at 236; In re Waring, 491 B.R. 324, 334 (Bankr. E.D.N.Y. 2013).

In this proceeding, the entire history between the Debtor and the Defendant involved only twelve shipments and six payments over a seven month period prior to filing of the bankruptcy petition. During that time, the Debtor made four payments in the pre-preference period and two payments during the preference period. Thus, the relationship between the Debtor and the Defendant was relatively short-lived and presents only a small window of information from which to establish a baseline of dealing. The

- 16 -

brevity of the parties' relationship presents a close question as to whether a sufficient baseline is present. However, given the nature of the transactions involved and the fact that neither party has raised an issue regarding the sufficiency of the baseline, the court concludes as discussed below that the pre-preference period relationship in this case is sufficient to allow the court to discern a pattern of ordinary conduct for purposes of section 547(c)(2)(A).

During the baseline period, the Defendant shipped gasoline to the Debtor on four separate occasions. The first invoice contained a payment term of "net 7 day" and the three remaining invoices each contained a payment term of "net 10 day." Notwithstanding these provisions in the invoices, the Debtor consistently paid the invoices more than 7 or 10 days after the date of the invoices, averaging 39 days (median 30) between shipment and payment.[1] The least amount of time between shipment and payment was 27 days and

---

[1] The following table summarizes the baseline shipments and baseline transfers.

| Invoice Date | Actual Payment | | Days Between Invoice & Payment |
|---|---|---|---|
| 9/15/2010 | 10/21/2010 | | 36 |
| 10/1/2010 | 10/28/2010 | | 27 |
| 10/6/2010 | 11/4/2010 | | 29 |
| 10/12/2010 | 12/16/2010 | | 65 |
| | | Average | 39 |
| | | Median | 30 |

the longest amount of time was 65 days. During the baseline period employees of the Defendant would call the Debtor at some point after the invoices became due to remind and encourage the Debtor to pay. The Debtor made each of its payments during the baseline period by sending a printed check to the Defendant at its regular place of business, drawn on the Debtor's operating account. Upon receipt of the checks, the checks were listed on the Defendant's deposit slips along with other checks that the Defendant had received and included in Defendant's regular bank deposits.

Viewing the undisputed facts in the light most favorable to the Defendant, the court finds that the subjective ordinary course of business between the Debtor and the Defendant was that (1) it was ordinary for the Debtor to pay the invoices after the times specified in the invoices; (2) such payments were made on an average of 39 days after the shipment and sometimes after receiving a call from the Defendant; (3) it was ordinary for the Debtor to only pay one invoice at a time and to pay the oldest outstanding invoice in full prior to paying the next oldest invoice; (4) it was ordinary for the Debtor to pay for the shipments only by printed check drawn from its operating account; and (5) it was ordinary for the Debtor to send the printed checks to the Defendant at its place of business and for the Defendant to include such checks in with other checks and deposits after receiving the printed checks.

Having established the baseline, the court turns to other factors to be considered in making the section 547(c)(2)(A) analysis. Such factors include whether the amount and form of the payment conformed with the baseline practice and whether the debtor or creditor engaged in any unusual payment activities. As to the form of payment, courts typically examine both method of payment, e.g., payment by wire or by check, and the timing of payment compared to the baseline. See, e.g., Central Hardware Co. v. Sherwin-Williams Co. (In re Spirit Holding Co.), 153 F.3d 902 (8th Cir. 1998) (wire transfers made to replace checks were not in ordinary course); In re Tolona Pizza Products Corp., 3 F.3d 1029 (7th Cir. 1993)(timing analysis).

Turning to the timing component, "late payments [during the preference period] may be held to be made in the ordinary course of business, when such payment practices were well-established between the parties." In re Jeffery Bigelow Design Group, 956 F.2d 479, 486 (4th Cir. 1992). "[I]f late payments were the standard course of dealing between the parties, they shall be considered within the ordinary course of business under section 537(c)(2)." Yurika Foods Corp. v. United Parcel Serv. (In re Yurika Foods Corps.), 888 F.2d 42, 44 (6th Cir. 1989). Here, the evidence shows that during the Preference Period, the Debtor continued the pattern of paying the Defendant's invoices outside the 10 day period specified in the

invoices.[2]   However, the length of time between the dates of the invoice and the dates of payment differed during the Preference Period.   Whereas the average delay during the Baseline Period was 39 days, the single payment on March 9 resulted in an acceleration in the payment of the invoices.   Thus, the 2/18/11 invoice had been outstanding only 19 days when it was paid, the 2/14/11 invoice had been outstanding only 23 days when it was paid, the 2/11/11 invoice was paid after only 26 days, and the average number of days between all Preference Period invoices and payment of the invoices was 29 days, as compared to the Baseline Period average of 39 days.   The foregoing payments also fell outside the range of the payments during the Baseline Period, which was a low of 27 days and a high

---

[2]

| Product | Invoice Date | Actual Payment | Days Between Invoice & Payment |
|---------|-------------|----------------|-------------------------------|
| gasoline | 1/28/2011 | 3/9/2011 | 40 |
| gasoline | 2/3/2011 | 3/9/2011 | 34 |
| gasoline | 2/5/2011 | 3/9/2011 | 32 |
| gasoline | 2/9/2011 | 3/9/2011 | 28 |
| gasoline | 2/11/2011 | 3/9/2011 | 26 |
| gasoline | 2/14/2011 | 3/9/2011 | 23 |
| gasoline | 2/18/2011 | 3/9/2011 | 19 |
| | | Average | 29 |
| | | Median | 28 |

| Product | Invoice Date | Actual Payment | Days Between Invoice & Payment |
|---------|-------------|----------------|-------------------------------|
| glycol | 2/1/2011 | 3/22/11 | 49 |

- 20 -

of 65 days.  While this circumstance alone may not be decisive, it weighs against the Defendant's position that the March 9 payment was made in the ordinary course of business.

Apart from the early payment of invoices, the method, manner and circumstances of the March 9 payment establish that the March 9 payment was not made in the ordinary course of business because such payment differed markedly from the prior dealings between the parties.  First, the March 9 Payment settled all outstanding invoices.  During the baseline, the first payment merely settled the first invoice; three unpaid invoices remained after that first payment and the subsequent payments each paid a single invoice. During the Preference Period, however, the March 9 Payment, which was 8.6 times larger than largest payment made to the Defendant by the Debtor prior to the Preference Period, settled seven separate, outstanding invoices all with one payment.  Second, all baseline payments were drawn from the Debtor's operating account.  The March 9 Payment, however, was the only payment that was drawn from the Debtor's payroll account and was 43 times larger than the next largest check ever issued from the payroll account.  Third, the March 9 Payment was issued by a handwritten countercheck which was hand delivered to the bank by the Debtor.  The baseline payments, on the other hand, were made by sending a printed check to the Defendant at its regular place of business, drawn on the Debtor's operating account.  Upon receipt of the checks, the checks were

listed on the Defendant's deposit slips along with other checks
that the Defendant had received and included in the regular bank
deposits which were made by the Defendant.    Finally, the
circumstances surrounding the March 9 Payment clearly demonstrate
that the transfer was not made in the ordinary course.    The final
shipment of gasoline was delivered on February 18 about one week
before the Debtor went into "shut-down mode."    At this point, the
Debtor had yet to pay any of the outstanding invoices.    Under their
ordinary course of business, the Debtor would have likely paid the
January 28 invoice on February 27 and the February 3 invoice on
March 5.    However, rather than paying off those invoices as it had
during the baseline period, the Debtor entered into an arrangement
hatched by the Defendant in which the Defendant would accept
ethanol in lieu of cash payments.    Accepting the Defendant's
proposal, the Debtor immediately shipped the ethanol to the
Defendant.    It was then realized that the Debtor was obligated to
sell all of its ethanol to C&N and that no transaction was possible
without the approval of C&N.    In order to clean up the failed
barter, the parties agreed to a three-party transaction which
required the Debtor to "wire the funds to [the Defendant's] account
as soon as [it] received the proper approvals."    The urgency sought
by the Defendant was implemented by the Debtor going to the bank
and issuing a handwritten check for direct deposit into the
Defendant's bank account.    The undisputed facts demonstrate that

- 22 -

the three-party transaction that was implemented on March 9 with the deposit of the handwritten countercheck was finalized on March 8, the same day that the Debtor held the meeting to discuss its cash flow issues and a possible bankruptcy filing.

Based upon the foregoing undisputed facts, the court finds that the March 9 Payment was unlike the prior payments between the parties and was far different from the subjective ordinary course of business established through their 2010 dealings. Because there are no issues of material fact regarding this issue, the Court concludes that the Plaintiff is entitled to summary judgment on the 547(c)(2)(A) defense with respect to the March 9 Payment. The March 22 Payment, however, was made in the ordinary course. It was paid with a printed check drawn from the Debtor's operating account. The payment was made well after the March 8 meeting and none of the other factors such as pressure or unique collection activities have been shown as to that payment. Accordingly, the court will deny the Plaintiff's motion for summary judgment as to the March 22 payment.

In concluding that the Plaintiff is entitled to summary judgment as to the section 547(a)(2)(A) issue, the court has examined the affidavit of Vera Haskins which was submitted by the Defendant. Ms. Haskins was identified by the Defendant as an expert witness pursuant to Rule 26(a)(2)(A) and her expert report was duly submitted and served during discovery pursuant to Rule

26(a)(2)(B).   Her written report, which is attached to and incorporated into her affidavit, is relied upon by the Defendant in opposing the Plaintiff's motion for summary judgment.

The Plaintiff has objected to and moved to exclude the Haskins affidavit (hereinafter referred to as the "Haskins Report" or the "Report"), asserting that the Report does not comply with Rule 702 and therefore is not admissible and should be excluded from consideration in deciding the motion for summary judgment.[3] Since the Defendant seeks to provide opinion evidence pursuant to the Haskins Report, Evidence Rule 702 is implicated.   While a witness may qualify to provide opinion testimony based upon the experience of the witness[4], the requirements of Rule 702 are applicable to

---

[3]   Rule 702 of the Federal Rules of Evidence provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>> (a)   the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>> (b)   the testimony is based on sufficient facts or data;
>> (c)   the testimony is the product of reliable principles and methods; and
>> (d)   the expert has reliably applied the principles and methods to the facts of the case.

[4]   Rule 702 provides that a "witness who is qualified as an expert by knowledge, skill, _experience_, training, or education may testify in the form of an opinion."   (emphasis added).

- 24 -

such a witness to the same extent as where an expert opinion is based upon scientific or technical knowledge or principals. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141, 116 S.Ct. 1167, 1171, 143 L.Ed.2d 238 (1999)("We conclude that Daubert's general holding—setting forth the trial judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge."). Thus, the Haskins Report must comply with Rule 702 in order for the opinions contained therein to be considered by the court in ruling on the Plaintiff's motion for summary judgment.

The Haskins Report contains both an opinion as to whether the March 9 payment was made in the ordinary course of business pursuant to section 547(c)(2)(A) and an opinion as to whether such payment was made according to ordinary business terms pursuant to section 547(c)(2)(B). In that regard, the Report states:

> As explained more fully, it is my opinion that the parties did establish an "ordinary course of business" relationship and that the payment in question was made in that ordinary course. It is also my opinion that the payment in question was made within "ordinary business terms" when measured against industry norms for wholesale sellers of petroleum products and commercial customers.

Haskins Report, at 1.

The court first will address the admissibility of the opinion that the March 9 payment was made in the ordinary course of business

within the meaning of section 547(c)(2)(A).  The Plaintiff argues that even if Vera Haskins qualifies as an expert in the applicable industry, i.e., wholesale sales of petroleum products to commercial customers, as asserted in the Report, her opinion regarding whether the March 9 payment was made in the ordinary course of business is not admissible because it is not based upon sufficient facts or data, is not the product of reliable principles and methods, is not the result of the reliable application of such principles and methods to the facts of this case and would not help the court in understanding the evidence in this proceeding or in making the determinations required under section 547(c)(2).

Broadly speaking, the determination of whether a payment was made in the ordinary course of business involves comparing the payment in question to prior payments that the debtor made to the creditor.  There is nothing about the evidence in this proceeding regarding the payments that were made prior to the Preference Period that requires the input of an expert in order for the court to understand such evidence. In fact, the dates and amounts of the shipments, the billing for the shipments, and the date, amount and method of payment prior to the Preference Period are all undisputed. The same is true regarding the shipments, billing and payments during the Preference Period.  As Ms. Haskins admitted in her deposition, specialized knowledge is not necessary in order to make a comparison between the March 9 payment and the prior payments made

by the Debtor.[5]  Moreover, it is clear from her deposition testimony that Ms. Haskins' methodology in opining about "ordinary course of payment" is contrary to applicable law and could not possibly provide helpful guidance or assist the court in making that determination.  Thus, in arriving at her opinion Ms. Haskins relied entirely upon the frequency and timing of the deliveries and payments.[6] In making this stunted examination, she looked at the transactions at issue solely from the standpoint of the recipient of the payment.[7]  It is also her opinion that the method of payment is "irrelevant to the analysis of whether or not [the March 9] payment was made in the ordinary course of business between the parties."[8]  As discussed earlier, whether a payment was made in the ordinary course of business involves a subjective inquiry that focuses on the manner in which the debtor and the creditor ordinarily conducted business.  The standards or criteria created to define and interpret the term "ordinary course of business" involve a question of law.  E.g., Martino v. First Nat'l Bank of Harvey (In re Garofalo's Finer Foods), 186 B.R. 414, 421 (N.D. Ill. 1995).  Under applicable law, examining the manner in which the parties ordinarily conducted business is a broad inquiry. Transactions must be ordinary from both the debtor's and the

---

[5]Haskins Depos., p. 46.
[6]Haskins Depos., p. 64.
[7]Haskins Depos., pp. 63-64.
[8]Haskins Depos., p. 62.

transferee's perspectives and must be examined from both perspectives. In re Milwaukee Cheese Wisconsin, Inc., 112 F.3d 845, 848 (7th Cir. 1997). And the circumstances to be examined in making the section 547(c)(2)(A) examination are not limited to just the timing of the payments involved. The examination instead includes other circumstances such as the amount and the form or method of the payments. Central Hardware Co.v. Sherwin-Williams Co. (In re Spirit Holding Co.), 153 F.3d 902 (7th Cir. 1998). Even if the opinion of an expert were appropriate regarding the legal meaning of "ordinary course of business," an opinion such as Ms. Haskins' opinion that is oblivious to the foregoing rudimentary requirements obviously is fatally flawed, is entitled to no weight in the determination of whether the March 9 payment was made in the ordinary course of business under section 547(c)(2)(A), and is insufficient to raise a jury issue regarding section 547(c)(2)(A).

The court also examined the affidavit of Jeffery Smith regarding the section 547(c)(2)(A) issue. Mr. Smith is Defendant's chief financial officer and has not been designated as an expert witness. With respect to the "ordinary course of business" defense, Mr. Smith—a fact witness—merely states that the Debtor and the Defendant "established a business relationship in which there were certain patterns of product delivery and payment therefore which established an expectation between them of what would be normal terms when the [Debtor's] plant began to operate at a high capacity.

The payments at issue were made within the terms of the expectations which had been established by the fall, 2011, experience." Aff. Jeffery Smith, ¶ 2. While the court would have to accept any facts stated in the Smith affidavit as true and view any such facts in the light most favorable to the Defendant for purposes of the summary judgment motion, the affidavit contains no facts that contradict any of the facts previously recounted in this opinion as being undisputed, nor is any support provided for the conclusory statement in the affidavit that the March 9 payment was made in the ordinary course of business. Therefore, similar to the Haskins Report, the Smith affidavit is entitled to no weight in the determination of whether the March 9 payment was made in the ordinary course of business under section 547(c)(2)(A), and is insufficient to raise a jury issue regarding section 547(c)(2)(A).

        C.    Were the Transfers Made According
              To Ordinary Business Terms

     To satisfy section 547(c)(2)(B), a creditor must demonstrate that the payments in question were "made according to ordinary business terms." 11 U.S.C. § 547(c)(2)(B). The Court of Appeals for the Fourth Circuit has agreed with the majority of circuits that an "ordinary business terms" analysis is objective in nature, requiring proof that the payment is ordinary in relation to prevailing industry standards. Advo-System, Inc. v. Maxway Corp., 37 F.3d 1044, 1048 (4th Cir. 1994). The purpose of the objective prong of section 547(c)(2)(B) is "to leave undisturbed normal

financial relations, because it [such an exception to the trustee's general avoidance powers] does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." Advo-System, 37 F.3d at 1047 (quoting legislative history; citing S.Rep. No. 989, 95 Cong., 2s Sess. 88 (1978) reprinted in 1978 U.S.C.C.A.N. 5787, 5784; see In re Fulgham Constr. Corp., 872 F.2d. 739, 743 (6th Cir. 1989) ("The objective standard was intended to 'protect recurring, customary credit transactions which are incurred and paid in the ordinary course of business of the Debtor and the transferee.') (quoting In re Energe Co-Op Inc., 832 F.2d 997, 1004 (7th Cir. 1987)). Thus, in order to satisfy section 547(c)(2)(B), a creditor must first establish the industry standard and then show that the payments in question were ordinary in relation to that standard. See Sigma Micro Corp. v. Healthcentral.com (In re Healthcentral.com); 504 F.3d 775, 791 (9th Cir. 2007).

Turning to the first component, the creditor must establish the relevant industry. Broadly defining the relevant industry standard, the court in Advo-System held that ordinary business terms refers to "the range of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary." 37 F.3d at 1048. (quoting In re Tolona Pizza Prods., Corp., 3 F.3d 1029 (7th Cir. 1993)). The

<u>Advo-System</u> court observed that establishing the industry in terms of this broad range has two primary features:

> First, it pragmatically defines "ordinary business terms" to encompass the "broad range" of terms used in the relevant industry. Consequently, the creditor is spared the task of "prov[ing] the existence of some single, uniform set of industry-wide credit terms, a formidable if not insurmountable obstacle given the great variances in billing practices likely to exist within the set of markets or submarkets which one could plausibly argue comprise the relevant industry . . . ." Second, <u>Tolona Pizza</u> broadly defines the relevant industry to encompass "firms similar in some general way to the creditor," recognizing that in most cases it is "difficult to identify the industry whose norm shall govern."

<u>Id.</u> at 1048-49 (citations omitted). A creditor thus is not required to prove narrowly defined credit industry terms; rather it may prove a range of terms that encompasses the practices engaged in by firms similar in some general way to the creditor.

The next step in the objective analysis is to determine how much deviation between the preference payment and industry norm is allowable under section 547(c)(2)(B). According to the Fourth Circuit, "the extent to which a preference payment's credit terms can stray from the industry norm and yet still satisfy § 547(c)(2)(C) depends on the duration of the debtor-creditor relationship." <u>Id.</u> at 1049. The significance of the duration of the relationship between the debtor and the creditor under section 547(c)(2)(B) was explained as follows in <u>Advo-System</u>:

- 31 -

> 'When the relationship between the parties is of recent origin, or formed only after or shortly before the debtor sailed into financially troubled seas, the credit terms will have to endure a rigorous comparison to credit terms used generally in a relevant industry.'  In such a case, only those 'departures from [the] relevant industry's norms which are not so flagrant as to be 'unusual' remain within subjection C's protection.  On the other end of the spectrum, 'when the parties have had an enduring, steady relationship, one whose terms have not significantly changed during the pre-petition insolvency period, the creditor will be able to depart substantially from the range of terms established under the objective industry standard inquiry and still find a haven in subjection C.

Id. (quoting Molded Acoustical Prods., 18 F.3d at 225-26).

As previously noted, BAPCPA amended the section 547(c)(2) defense by substituting "or" for "and" and thereby allowing the creditor to prevail by proving either the subjective or the objective prongs.  However, BAPCPA did not amend the wording of either subparagraph (A) or (B), both of which were left unaltered. It thus appears that the above sliding scale adopted in Advo-System remains in tact.  This means that where, as in this proceeding, a relationship between the parties is of recent origin, the credit terms of the transaction at issue will have to endure a rigorous comparison to credit terms used in the creditor's industry.  In such case, strict adherence to the industry standard is required and a deviation that is merely unusual will place the payment outside the safe harbor of section 547(c)(2)(B).   Advo-System, 37 F.3d at 1049.

Typically, creditors offer expert testimony in order to establish the relevant industry standards and that the payments it received were made according to such industry standards. In this proceeding, the Defendant seeks to present such evidence through the affidavit/written report of Vera Haskins. Ms. Haskins has been designated by the Defendant as its expert witness. The other affiant, Mr. Smith, has not been designated as an expert witness.

The court has examined the Affidavit with regard to the section 547(c)(2)(B) issue, as well as the section 547(c)(2)(A) issue. As previously noted, the Smith affidavit contains no factual statements that contradict any of the facts which have been identified as undisputed, nor does the affidavit contain factual support for the conclusory statement in the affidavit that the March 9 payment was made according to ordinary business terms. The third paragraph of the affidavit states that "the Payments at issue were also made within ordinary business terms as established in the patterns of experience between Sampson Bladen and its other commercial customers." This statement is merely a conclusory statement with respect to the ultimate legal determination to be made in this proceeding, and therefore is insufficient to create a genuine issue of material fact. See, e.g., Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002) ("conclusory or speculative allegations do not suffice, nor does a 'mere scintilla of evidence' in support of his case"). Moreover, Mr. Smith was not designated

as an expert and Plaintiff has made no showing that he is qualified to express such an opinion. Finally, Mr. Smith's reference only to transactions of the Defendant with its customers cannot serve to establish industry standards. See Lawson v. Ford Motor Co. (In re Roblin Industries, Inc.), 78 F.3d 30, 43 (2d Cir. 1996)(reliance solely on the experience of the creditor is insufficient to show industry standard or practice).

The question that remains is whether the Haskins Report is sufficient to raise a jury issue as to whether the March 9 payment was made according to ordinary business terms. The qualification of Ms. Haskins as an expert is based entirely upon her experience. As previously noted, an experiential expert witness must satisfy the requirements of Rule 702 to the same extent as any other expert witness. In U.S. v. Wilson, 484 F.3d 267 (4th Cir. 2007), the Fourth Circuit provided guidance for determining whether an experiential witness has satisfied the reliability requirement imposed by Rule 702. Quoting from the advisory committee's notes related to Rule 702, the court described the reliability requirements for such a witness as follows:

> While a district court's task in examining the reliability of experiential expert testimony is therefore somewhat more opaque, the district court must nonetheless require an experiential witness to "explain how [his] experience leads to the conclusion reached, why [his] experience is a sufficient basis for the opinion, and how [his] experience is reliably applied to the facts."

Id. at 274.

The description of her experience and how her experience led to the conclusions and opinions contained in the Haskins Report are tersely described as follows:

> In over 30 years experience in the petroleum industry, I have observed many business relationships between a petroleum supplier and its customers. Certain patterns of "ordinary" conduct can be identified.

Haskins Report, at 1.

It is borderline whether Ms. Haskins, in her Report or deposition testimony, has explained how her experience led to the conclusions and opinions she reached or why her experience is a sufficient basis for those conclusions or opinions. The reference to having observed "many business relationships" is very general and provides little support regarding the basis for or reliability of the opinions she states in her report. Nothing is provided regarding how her observations occurred or were conducted, whether her observations were such that they provide a reliable basis for her opinions, or what is meant by "many" business relationships. Without such information, it is difficult to assess whether her experience is a sufficient basis for her opinions or whether her experience reliably has been applied to the facts of this case. Compare, Pereira v. United Parcel Service of America, Inc. (In re Waterford Wedgwood USA, Inc.), 508 B.R. 821, 829-30 (Bankr. S.D.N.Y. 2014), where the expert examined data collected by the Credit Risk

Monitor database, compiled a list of businesses as the relevant industry and provided a detailed explanation of how he calculated the average number of days for the payment of invoices in that industry. Furthermore, as described in the Report, the result of the witness's observations is that "certain patterns of 'ordinary' conduct" can be identified. Whether such "patterns" are such that they constitute standard practices for the industry is not addressed in the Report. However, despite these shortcomings, whether the Report should be excluded is a moot issue because, even if admitted into evidence, the Report is not sufficient to show that the March 9 payment was made according to ordinary business terms under section 547(c)(2)(B).

According to the Report[9], the "pattern" for payment terms can fall "anywhere from 7 days to 45 days, depending on the customer's cash flow needs." The Report apparently concludes (but does explicitly state) that the March 9 payment was made according to these payment terms because it came within 7 to 45 days of each of the invoices that were paid by March 9 payment. The Report deals

-----

[9]According to the Report, the relevant industry is "wholesale sales of petroleum products to commercial customers." The Plaintiff argues that this definition is too broad and that the relevant industry should be narrowed to wholesale sales of petroleum to operators of ethanol plants. The Plaintiff's narrow definition is inconsistent with the definition discussed in Advo-System (i.e., firms similar in some general way to the creditor) and is not accepted. Consistent with Advo-System, the court will accept the relevant industry as being wholesale sales of petroleum products to commercial customers. See Advo-System, 37 F.3d at 1051.

with the size of the March 9 payment and what is referred to as "batching" by observing that "[i]t is not at all uncommon for there to be larger single payments when there have been sharply more frequent shipments requested by the customer."[10]  Whether not being "uncommon" constitutes an industry standard is left unanswered. That there was an attempt by the Defendant to obtain "payment through barter" is said to be "not unusual in the commercial petroleum products industry."  Again, is being "not unusual" the same as an industry standard or practice?  Regarding the three-party transaction that ensued when the barter failed, the Report blithely observes that "[w]hether the transaction ended up as a direct barter or as a three party transaction, such dealings are ordinary with the industry."  Finally, the Report purports to address what is "ordinary" in the petroleum industry where a petroleum distributor is paid by a check from the customer.  In doing so, the Report describes and relies upon a fact situation involving the processing of payments that is significantly different that the fact situation actually present in this proceeding.  In that regard, the Report states:

> When a check for payment is received by a

---

[10]Another problem with the Report is that the opinion regarding "batching" is based upon facts that do not appear in the record. On page 2 of the Report, Ms. Haskins states: "The more frequent shipments from Jan 28 to Feb 18 occurred with an understanding that payment would be by batch (single payment)."  There is no evidence that there was any such understanding regarding the shipments in January and February.

> commercial supplier, it is examined for proper
> signature, deposited, and applied to the
> appropriate invoices outstanding.  It is not
> out of the ordinary to accept a payment from
> any valid source from a customer.  Also, upon
> inspection of the document copy [the March 9
> check] there was no indication on the face of
> it that the March 9th payment had come from a
> payroll check.

Haskins Report, at 2.

Unlike the assumptions in the foregoing provision of the
Report, this is not a case in which a check was mailed or sent to
a distributor who processed the check at its place of business and
then deposited the check into its bank account.  In this case, the
March 9 check was not mailed or sent to the Defendant.  Rather, the
undisputed facts in this proceeding are that the Defendant had the
Debtor go to the bank where the Defendant had its checking account
and for the Debtor to write a countercheck payable to the Defendant
at the bank and for the Debtor to make the deposit into the
Defendant's account.  There is noting in the Report that could be
interpreted as stating that such a highly unusual payment was made
according to ordinary business terms.  The Report thus is
insufficient to create a jury issue as to whether the March 9
payment was made according to ordinary business terms.

According to the Fourth Circuit, the exception created by
section 547(c)(2) should be applied in a manner that does not
detract from the general policy of section 547 to discourage unusual
action by either the Debtor or it creditors during the debtor's

slide into bankruptcy.  Advo-System, 37 F.3d at 1047.  The manner of the March 9 payment clearly was unusual and occurred during the Debtor's slide into the bankruptcy that was filed less than a month after the March 9 payment.  Neither the Report nor any thing else in the record provides any evidence that when the Debtor went to the Defendant's bank in order to make the March 9 payment, such payment was a "recurring, customary credit transaction" that occurred according to ordinary business terms.  See In re Fulgham Constr. Corp., 872 F.2d 743.  Since the Defendant has failed to offer evidence that would support a finding that the March 9 payment was made according to ordinary business terms, the Plaintiff is entitled to summary judgment as to the Section 547(c)(2)(B) issue.

CONCLUSION

It is undisputed that the March 9 and March 22 payments by the Debtor were preferential under section 547(b) of the Bankruptcy Code. The undisputed facts establish that the March 9 payment of $193,534.92 was not made in the ordinary course of business under section 547(c)(2)(A) and the evidence relied upon by the Defendant is insufficient to raise a jury issue as to whether such payment was made according to ordinary business terms under section 547(c)(2)(B).  The Plaintiff therefore is entitled to summary judgment as to the $193,534.92 payment adjudging that such payment is an avoidable transfer and that the Plaintiff may recover the amount of such payment from the Defendant for the benefit of the

- 39 -

bankruptcy estate pursuant to section 550 of the Bankruptcy Code. Because there is evidence that would support a finding that the March 22 payment of $481.72 was made in the ordinary course of business, the court will deny the Plaintiff's motion for summary judgment with respect to the $481.72 payment.  A summary judgment so providing is being entered contemporaneously with the filing of this memorandum opinion.  A separate order will be entered with respect to the Plaintiff's motion in limine.

This 1st day of July, 2014.

WILLIAM L. STOCKS
United States Bankruptcy Judge